D. Todd Mathews
*Pro Hac Granted, MDL 3199*
BAILEY GLASSER, LLP
210 W. Division St., Bldg. 2
Maryville, IL 62062
Phone: (618) 418-5180
Fax: (304) 342-1110
tmathews@baileyglasser.com

Lee A. Floyd
*Pro Hac Granted, MDL 3199*
FLOYD LAW
626 East Broad Street,
Suite 300
Richmond, Virginia 23219
Phone: (804) 529-0000
Fax: (804) 529-0009
lee@floydpc.com

*Attorney[s] for Plaintiff JANE DOE BGFL-0037*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

IN RE: APPLE AIRTAG MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION

This Document Relates To:

JANE DOE BGFL-0037,

Plaintiff,

v.

APPLE INC.,

Defendant.

MDL No. 3199

Case No. 5:26-md-03199-NW

Member Case No. 5:26-cv-13164

Judge: Hon. Noël Wise

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1. NEGLIGENCE
2. STRICT LIABILITY -- DESIGN DEFECT (RISK-BENEFIT TEST)
3. VIOLATIONS OF THE UCL'S UNLAWFUL PRONG, CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ*.

4. VIOLATIONS OF THE UCL'S UNFAIR PRONG, CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ*.
5. FAILURE TO WARN
6. FRAUDULENT CONCEALMENT/INTENTIONAL MISREPRESENTATION
7. VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT, 15 O.S. § 751, ET SEQ.
8. INVASION OF PRIVACY, INTRUSION UPON SECLUSION

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. This is an action brought by Plaintiff JANE DOE BGFL-0037 ("Plaintiff") against Defendant Apple Inc. ("Apple") for injuries sustained as a result of Apple's design, manufacture, marketing, and sale of the AirTag tracking device. Apple designed and released the AirTag with full knowledge that the device could be--and was being--weaponized by stalkers, abusers, and other bad actors to secretly track, surveil, and terrorize individuals without their knowledge or consent.

2. Apple AirTags are small, coin-sized tracking devices manufactured and sold by Apple since April 2021. Apple markets AirTags as a way to "keep track of your stuff"—keys, wallets, luggage, and other personal belongings. However, from the moment Apple released the AirTag to the public, the company knew that the device's small size, long battery life, seamless integration with Apple's global "Find My" network, and lack of meaningful anti-stalking protections made it an extraordinarily dangerous tool for covert surveillance.

3. Apple designed the AirTag to be small and easily concealable. The AirTag measures just 31.9 mm in diameter and 8 mm in height--roughly the size of a large button--and weighs only 11 grams. The device is powered by a standard CR2032 battery that lasts

approximately one year, meaning that a stalker can hide an AirTag on a victim and track her location continuously for up to twelve months without ever replacing the battery.

4. Apple integrated the AirTag with its "Find My" network--a crowd-sourced location network comprising over one billion Apple devices worldwide, including iPhones, iPads, and Mac computers. When an AirTag is near any Apple device in the "Find My" network, that device automatically and silently transmits the AirTag's location to its owner via Apple's servers. This means that a stalker can track a victim's precise location--in real time--anywhere in the world where there are Apple devices, which is effectively everywhere.

5. Apple was aware before the AirTag's release that its tracking device posed serious risks of stalking and domestic violence. Before launching the AirTag, Apple's own engineers and safety team raised internal concerns about the potential for misuse. Industry experts and domestic violence advocates similarly warned Apple that the device, as designed, would inevitably be weaponized to stalk and harass victims.

6. Despite these warnings, Apple launched the AirTag in April 2021 with only minimal, ineffective safety measures. Apple's primary anti-stalking measure was a feature that would cause an AirTag to emit a brief audio alert after being separated from its owner for three days. This feature was woefully inadequate: the alert was quiet and easily missed; it only activated after three days of separation; and it did nothing to prevent stalking during the initial three-day period--or ever--if the stalker periodically retrieved and reset the AirTag.

7. Apple's initial anti-stalking measures were designed to be as unobtrusive and minimally effective as possible in order to protect AirTag sales revenue. Apple was aware that loudly alerting potential victims of stalking would deter consumer adoption of the AirTag and harm its commercial success. Apple chose profits over safety.

8. The results were as predictable as they were devastating. Within months of the AirTag's release, law enforcement agencies across the United States and internationally began receiving reports of AirTags being used to stalk and track individuals without their consent.

Victims of domestic violence and stalking reported discovering AirTags hidden in their vehicles, clothing, bags, and other personal belongings.

9. Media outlets began publishing reports of AirTag stalking incidents shortly after the device's release. By early 2022, AirTag stalking had become a widely recognized public safety crisis. Major news organizations including the New York Times, Washington Post, Vice, and dozens of local news outlets published investigations documenting the epidemic of AirTag-enabled stalking.

10. Police departments across the country began issuing public warnings about AirTag stalking. The Indianapolis Metropolitan Police Department, the New York City Police Department, and many other law enforcement agencies documented numerous cases of AirTag stalking and distributed safety advisories to the public.

11. Apple received tens of thousands of reports of AirTag-enabled stalking and harassment. Upon information and belief, as of the filing of this Complaint, Apple has received more than 40,000 reports from individuals who discovered AirTags being used to track them without their knowledge or consent.

12. Apple CEO Tim Cook was personally briefed on the scope of the AirTag stalking crisis. Despite this direct knowledge at the highest levels of Apple's leadership, Apple continued to design, manufacture, market, and sell the AirTag without implementing adequate safety protections.

13. Apple's response to the AirTag stalking crisis was slow, inadequate, and insufficient to address the scope of the problem. In February 2022--nearly a year after the AirTag's release—Apple announced a series of minor updates to the AirTag's anti-stalking features, including reducing the time before the audio alert from three days to a random period between eight and twenty-four hours. These updates were still wholly inadequate to prevent AirTag-enabled stalking.

14. Apple's updated anti-stalking measures remained grossly deficient. The audio alert is still easily missed or ignored. The alert only sounds after the AirTag has been separated from its

registered owner--meaning a stalker who regularly checks in on or resets the AirTag can prevent the alert from ever sounding. More fundamentally, Apple never implemented the most basic and effective anti-stalking feature: requiring that AirTags be registered to a verified identity that could be disclosed to law enforcement.

15. Apple also failed to implement an opt-in consent mechanism that would have required the AirTag owner to obtain affirmative consent from any individual being tracked. Such a consent mechanism would have been technically simple for Apple to implement and would have dramatically reduced the AirTag's utility as a stalking tool while preserving its legitimate uses.

16. Safer alternative designs were available to Apple. For example, Apple could have: (a) required verified identity registration for all AirTag owners; (b) implemented opt-in consent requirements for tracking individuals; (c) caused AirTags to alert non-owners much sooner after the device began traveling with them; (d) enabled louder or more persistent alerts; (e) created a mechanism for law enforcement to quickly identify the registered owner of an AirTag; and (f) implemented geofencing restrictions that prevented AirTags from being used to track individuals over extended distances or time periods.

17. Apple chose not to implement these safer alternatives because doing so would have reduced the AirTag's convenience, commercial appeal, and integration with Apple's broader ecosystem. Apple's design choices were not the result of technical impossibility but of deliberate business decisions that prioritized commercial success over user safety.

18. As a direct and proximate result of Apple's defective design and negligent conduct, countless individuals across the United States--predominantly women--have been subjected to unwanted surveillance, stalking, harassment, and physical violence by individuals who used AirTags to track their locations without consent.

19. In multiple documented cases, AirTag-enabled stalking has led directly to physical assaults, domestic violence incidents, and at least one murder. In January 2022, a woman in Indiana was killed by her ex-boyfriend, who had used an AirTag to track her location. This tragedy was foreseeable--and preventable--had Apple implemented adequate safety measures.

20. Apple's conduct in designing and releasing the AirTag without adequate anti-stalking protections constitutes negligence. Apple owed a duty of care to foreseeable victims of AirTag-enabled stalking--individuals in whose vehicles, bags, or belongings an AirTag might be secretly placed. Apple breached that duty by designing a product it knew would be used to harm others and by failing to implement reasonable safety measures.

21. Apple's AirTag is also defectively designed under the risk-benefit test applicable to strict products liability claims. The risks of the AirTag's design--specifically, its utility as a stalking device—outweigh its benefits when measured against the availability of safer alternative designs. Apple's own engineers identified safer alternatives before the AirTag's launch. Apple rejected those alternatives for commercial reasons.

22. Apple's conduct also constitutes unlawful business practices under California Business and Professions Code § 17200 et seq. (the "UCL"). Apple's design and sale of a defective product constitutes an unlawful business practice predicated on violations of applicable products liability law. Apple's conduct further constitutes unfair business practices under the UCL because the harm to consumers and stalking victims vastly outweighs any utility of Apple's design choices.

23. Apple's unfair business practices include, without limitation: (a) designing the AirTag without adequate anti-stalking features despite known risks; (b) marketing the AirTag as a safe consumer product without disclosing its known stalking risks; (c) failing to implement technically feasible safety improvements after receiving tens of thousands of stalking reports; and (d) prioritizing AirTag revenue over the safety of foreseeable victims.

24. Plaintiff seeks injunctive relief on behalf of the general public of California pursuant to the UCL to require Apple to implement adequate anti-stalking measures in the AirTag, including but not limited to: opt-in consent requirements, verified identity registration, enhanced alert mechanisms, and law enforcement access protocols.

25. Plaintiff seeks compensatory and punitive damages for the personal injuries she sustained as a direct and proximate result of Apple's negligence and the defective design of the

AirTag. Plaintiff's injuries include anxiety, stress, disruption to her daily life and activities, and other damages as set forth herein.

26. Apple knew, or in the exercise of reasonable care should have known, that the AirTag's design made it a dangerous instrumentality for stalking and that the foreseeable misuse of the AirTag would result in serious physical, psychological, and economic harm to innocent victims. Apple's failure to design a safe product and its failure to warn of known dangers constitutes actionable negligence and products liability.

27. The AirTag's defective design is not a latent or hidden defect that Apple discovered only after the product reached the market. Apple was warned about the stalking risk before launch. Apple proceeded with the launch anyway, with knowledge that its product would be weaponized against innocent people. This knowing disregard of a known and serious safety risk supports an award of punitive damages.

28. Apple's post-release conduct further evidences its disregard for victim safety. Rather than promptly recalling or redesigning the AirTag when it became clear that the device was causing widespread harm, Apple engaged in a series of incremental, inadequate half-measures designed to create the appearance of safety concern while protecting AirTag revenues.

29. Plaintiff brings this action individually to recover damages for her injuries and, with respect to the UCL claims, to obtain public injunctive relief benefiting the public. Plaintiff does not seek class certification at this time.

30. The allegations in this Complaint are not merely conclusory. They are based on publicly available reports, documented law enforcement incidents, Apple's own public statements and marketing materials, the testimony and published statements of domestic violence advocates and cybersecurity experts, published news articles and investigations, and Plaintiff's own firsthand experience.

31. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the parties. Plaintiff is a resident of Salina, Oklahoma, and a citizen of the State of Oklahoma; Defendant Apple is a citizen of California. The amount in

controversy exceeds $75,000, exclusive of interest and costs. Additionally, Plaintiff asserts claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq., which are governed by California law and over which this Court exercises supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## PARTIES

32. Plaintiff JANE DOE BGFL-0037 ("Plaintiff") is a resident of Salina, Oklahoma, and a citizen of the State of Oklahoma.

33. Defendant Apple Inc. ("Defendant" or "Apple") is an American multinational technology company headquartered in Cupertino, California, within the Northern District of California. Apple is a citizen of the State of California for purposes of diversity jurisdiction under 28 U.S.C. § 1332. Among Apple's flagship items of consumer electronics is the AirTag, and Apple generally oversees all aspects of this device, including but not limited to its design, manufacture, marketing, and technical support and maintenance

## JURISDICTION AND VENUE

34. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on the diversity of citizenship of the parties. Plaintiff is a resident of Salina, Oklahoma, and a citizen of the State of Oklahoma. Defendant Apple is a citizen of the State of California. The amount in controversy exceeds $75,000, exclusive of interest and costs.

35. This Court has personal jurisdiction over Defendant Apple because Apple's principal place of business and headquarters are in Cupertino, California, within this judicial district. Apple purposefully directs its business conduct toward the State of California and the Northern District of California, transacts substantial business within this district, employs thousands of persons within this district, and maintains its global corporate operations within this district.

36. Apple's activities within the State of California and this judicial district gave rise to the claims asserted herein. The AirTag was conceived, designed, developed, engineered, tested, marketed, and released by Apple from its headquarters in Cupertino, California. The corporate

decisions underlying the defective design of the AirTag and Apple's failure to implement adequate safety measures were made within this district.

37. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Apple resides in this judicial district within the meaning of 28 U.S.C. § 1391(c). Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims asserted herein emanated from this district--Apple's headquarters are located at One Apple Park Way, Cupertino, California, within Santa Clara County, which lies within the Northern District of California. This action is filed in, and is part of, In re Apple AirTag Marketing, Sales Practices and Products Liability Litigation, MDL No. 3199.

38. This Court has supplemental jurisdiction over any state law claims asserted herein pursuant to 28 U.S.C. § 1367 because such claims are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

## INTRADISTRICT ASSIGNMENT

39. This action is assigned to the Honorable Noël Wise as part of In re Apple AirTag Marketing, Sales Practices and Products Liability Litigation, MDL No. 3199, Case No. 5:26-md-03199-NW.

## FACTUAL ALLEGATIONS

### A. Apple AirTags, Generally

40. Apple released the AirTag tracking device on April 30, 2021. The AirTag is a small, round, white disc roughly the size of a quarter. It weighs about 11 grams.

41. The AirTag uses Bluetooth technology to communicate its location. When an AirTag is within Bluetooth range of any Apple device--iPhone, iPad, or Mac--that Apple device anonymously and silently relays the AirTag's location back to the AirTag owner through Apple's "Find My" network.

42. Apple's "Find My" network is extraordinarily powerful because of the sheer number of Apple devices in use worldwide. As of the time of the AirTag's release, Apple had sold

over 1.65 billion devices, and approximately 64% of Americans owned at least one Apple product. Apple's own marketing materials boasted that the "Find My" network comprised over one billion Apple devices.

43. The AirTag's design made it uniquely suited for surreptitious placement. It is small enough to be slipped into a coat pocket, a purse, a bag, or underneath a car bumper without detection. It has a battery life of approximately one year. Once placed on a person's belongings, it requires no interaction from the stalker--it silently and automatically reports the victim's movements to the stalker's iPhone.

44. Eva Galperin, Director of Cybersecurity at the Electronic Frontier Foundation ("EFF") and a leading expert on stalkerware and technology-facilitated abuse, explained that the AirTag was "uniquely harmful" because of its tight integration with the Apple ecosystem. Apple's "Find My" network meant that even a person who did not own an iPhone could be tracked through the billions of Apple devices carried by other members of the public, all without any action on the part of those device owners and without their knowledge. As Ms. Galperin stated, the AirTag's integration with the "Find My" network made it far more powerful--and therefore far more dangerous--than any prior tracking device[1].

**B. Within Days of the Release of the AirTag, Technologists and Advocates Urged Apple to Consider the Risk Inherent in the Product**

45. Within days of the AirTag's release, domestic violence advocates, cybersecurity experts, and technology journalists sounded the alarm about the product's potential for misuse as a stalking tool.

46. The National Network to End Domestic Violence ("NNEDV"), a leading organization working on technology safety and domestic violence, immediately recognized the danger. Erica Olsen, the Safety Net Project Director at NNEDV, explained: "When somebody tries to leave an abusive person, or they are planning to leave, that can be one of the most dangerous times that stalking and assault can escalate. So, it's extremely important if people are planning to

[1] Albert Fox Cahn & Eva Galperin, *Apple's AirTags Are A Gift to Stalkers*, WIRED (May 13, 2021), https://www.wired.com/story/opinion-apples-air-tags-are-a-gift-to-stalkers/.

leave an abusive person, they're able to do so without the person tracking them down and finding them. It's a concern that people will be using any type of [tracking] product they can."[2]

47. On May 5, 2021--just five days after the AirTag's release--Geoffrey Fowler of the Washington Post published an article finding that AirTags were "terrifyingly good at [tracking]." "When I was riding my bike around town, it could update [my colleague] on my whereabouts every couple of minutes." The device even revealed Fowler's home address to his colleague, sparking privacy concerns. "So it's a double-edged sword with this kind of technology, and I think we need to talk more about it," Fowler said.[3]

48. Eva Galperin of the EFF raised concerns about the AirTag's stalking potential even before the product was released. When Apple previewed the product in April 2021, Ms. Galperin publicly warned that the combination of the AirTag's low cost ($29), small size, long battery life, and integration with the billion-device "Find My" network made it an extraordinarily powerful stalking tool. She urged Apple to implement robust protections before releasing the product to the public. Apple did not meaningfully respond to these concerns before launch.[4]

49. In a January 2022 press release, Albert Fox Cahn, founder and executive director of the Surveillance Technology Oversight Project ("S.T.O.P."), warned "Apple promises us 'privacy' and profits from surveillance…When survivors and advocates warned Apple that AirTags were dangerous, the company refused to listen. They claimed that their technical fixes would prevent abuse. Today, we see that they're wrong and that AirTags are being abused in

---

[2] Mark Wilson, *Apple AirTags could enable domestic abuse in terrifying ways*, FAST COMPANY (Apr. 29, 2021), https://www.fastcompany.com/90630404/apple-airtags-could-enable-domestic-abuse-in-terrifying-ways.

[3] Megan Cerullo, *Apple AirTags "terrifyingly good" at tracking stuff -- and potentially helping stalkers*, MONEYWATCH (May 11, 2021), https://www.cbsnews.com/news/apple-airtag-stalking-risk-tech-experts-warn/

[4] Michael Levitt, *AirTags are being used to track people and cars. Here's what is being done about it*, NPR (Feb. 18, 2022), https://www.npr.org/2022/02/18/1080944193/apple-airtags-theft-stalking-privacy-tech.

exactly the way we feared. There is no software upgrade to stop stalkers. The only solution is for Apple to stop selling stalkerware."[5]

**C. Apple Affirmatively Sought to Dismiss and Minimize Concerns About the Threats Surrounding AirTags**

50. Despite the immediate and widespread warnings from domestic violence advocates, cybersecurity experts, and technology journalists, Apple affirmatively sought to dismiss and minimize the concerns raised about the AirTag's potential for misuse.

51. Apple's public relations campaign in the weeks and months following the AirTag's release repeatedly emphasized the product's anti-stalking features. Apple representatives and spokespeople characterized the AirTag as "stalker-proof" and promoted the built-in alert features as sufficient protection against misuse. Apple's marketing materials made no mention of the significant gaps in those protections.

52. Internally, Apple was aware of the debate about the AirTag's potential for stalking abuse. Before the product's release, Apple engineers and executives discussed the risk that the AirTag would be used to stalk people. Despite this internal awareness, Apple chose to release the product without implementing the more robust protections that its own employees and external advocates had suggested were necessary.

53. One of the most significant design choices Apple made--and later quietly revised--was the alert delay built into the AirTag's notification system. When Apple originally released the AirTag, the device was programmed not to emit any sound alert for 72 hours after being separated from its owner. This meant that a stalker could place an AirTag on a victim's belongings and track the victim's movements for three full days before the AirTag would make any sound. Apple later shortened this delay to a range of 8 to 24 hours—but this change came only after public outcry, and even the shortened delay left victims exposed for extended periods.

---

[5] *S.T.O.P. Demands Apple Halt Sale of AirTags*, SURVEILLANCE TECH. OVERSIGHT PROJECT (Jan. 26, 2022), https://www.stopspying.org/content-input/2022/1/26/stop-demands-apple-halt-sale-of-airtags.

54. Apple's public statements about the AirTag's safety features were misleading. Apple consistently implied that the combination of sound alerts, iPhone notifications to the tracked person, and the "Find My" network made the AirTag a safe product that could not meaningfully be used for stalking.

55. These representations concealed the numerous and significant gaps in those protections, including the delayed alerts, the absence of any meaningful protection for Android users, the ability to disable sound alerts by removing the speaker, and the availability on resale markets of AirTags with their speakers removed. Apple's public messaging shifted the burden of safety onto victims rather than addressing the product's fundamental design flaws.

**D. Following Its Release, Reports Proliferated of People Being Stalked Via AirTags**

56. Despite Apple's public assurances, reports of AirTag-facilitated stalking proliferated almost immediately after the product's release.

57. A December 2021 New York Times article noted individuals reporting abuse on TikTok, Twitter, and Reddit, stating that "There is growing concern that the devices may be abetting a new form of stalking, which privacy groups predicted could happen when Apple introduced the devices in April."[6]

---

[6] Ryan Mac & Kashmir Hill, *Are Apple AirTags Being Used to Track People and Steal Cars?*, New York Times (Dec. 30, 2021), https://www.nytimes.com/2021/12/30/technology/apple-airtags-tracking-stalking.html.

58. As of December 2022, stalking incidents had been reported in New York,[7] California,[8] Pennsylvania,[9] Mississippi,[10] and even at Disney World,[11] as well as one woman reporting a harrowing experience in Paris following a flight from the US.[12]

59. On online platforms and forums, victims began sharing their experiences with AirTag stalking and law enforcement agencies across the United States began documenting a surge in AirTag-related incidents.

60. In several cases, AirTag stalking was linked to serious violence, including murder.

61. In January 2022 in Akron, Ohio, a woman was killed by her ex-partner, who had used an AirTag to track her movements.[13]

62. In June 2022 in Indianapolis, Indiana, a woman killed her partner after she used an AirTag to track him to a location.[14]

63. By early 2023, Apple itself had received over 40,000 reports of AirTag misuse. This figure almost certainly represents a fraction of actual incidents, as many victims never

---

[7] Sara Boboltz, *AirTags Are A Growing Headache For Apple Amid Disturbing Reports Of Tracking*, HUFFINGTON POST (Dec. 2, 2022) https://www.huffingtonpost.co.uk/entry/apple-airtags-tracking_n_61f425ade4b067cbfa1cb2b8.

[8] Ryan Mac & Kashmir Hill, *Are Apple AirTags Being Used to Track People and Steal Cars?*, NEW YORK TIMES (Dec. 30, 2021), https://www.nytimes.com/2021/12/30/technology/apple-airtags-tracking-stalking.html.

[9] Zahriah Balentine, *2 women believe Apple Airtag was used to stalk them after leaving Central Pa. restaurant*, WILLIAMSPORT SUN-GAZETTE (Jan. 21, 2022), https://www.sungazette.com/news/2022/01/2-women-believe-apple-airtag-was-used-to-stalk-them-after-leaving-central-pa-restaurant/.

[10] Sara Boboltz *AirTags Are A Growing Headache For Apple Amid Disturbing Reports Of Tracking*, HUFFINGTON POST (Dec. 2, 2022) https://www.huffingtonpost.co.uk/entry/apple-airtags-tracking_n_61f425ade4b067cbfa1cb2b8.

[11] Caitlyn Shelton, AirTag tracks family through Disney World, ABC News 10 (May 3, 2022) (available at https://www.news10.com/news/crime/airtag-tracks-family-through-disney-world/).

[12] Maggie Kim, *I Was Stalked with an Apple AirTag—Here's What I Wish I'd Known*, READER'S DIGEST (Feb. 11, 2022) https://www.rd.com/article/apple-airtag-stalking/.

[13] Bob Jones, *Family Believes Akron Mother Was Chased Before Murder*, NEWS5CLEVELAND (March 2, 2022) https://www.news5cleveland.com/news/local-news/akron-canton-news/family-believes-akron-mother-was-stalked-emotionally-abused-before-ex-boyfriend-killed-her.

[14] Alexis McAdams, *Apple AirTags, meant to help you track your stuff, have become tools of stalkers and criminals*, FOX NEWS (June 14, 2022), https://www.foxnews.com/tech/apple-airtag-stalking-dangerous-crime.

discover that they are being tracked, and many who do discover AirTags are never able to identify the perpetrator or make a formal report.

**E. Individuals Have Few, If Any, Meaningful Remedies When They Are Tracked**

64. As reports of AirTag stalking mounted, Apple's Chief Executive Officer Tim Cook received emails from concerned victims and advocates urging Apple to take more aggressive action. Apple's internal communications reveal that company executives were aware of the public relations problem the stalking reports presented, and that at least some of the company's response was driven by a desire to manage the public narrative rather than to address the underlying safety problems with the product.

65. The following sections describe the remedies available to different categories of victims and the significant limitations of those remedies.

**Remedies for iOS (iPhone) Users and Their Limitations**

66. Victims who own an iPhone receive a notification when an unknown AirTag has been traveling with them for a period of time. This notification is the primary protection Apple offers to iOS users. However, this protection has several critical limitations.

67. First, the alert is delayed. As noted above, Apple originally programmed the AirTag to wait 72 hours before alerting a victim that an unknown AirTag was traveling with her. Apple later shortened this window to between 8 and 24 hours—but even an 8-hour delay gives a stalker a significant window to track a victim's movements before she becomes aware of the device

68. Second, the victim cannot trigger the alert independently. The alert is generated by Apple's system based on the AirTag's movement patterns; the victim has no way to proactively scan for unknown AirTags using her iPhone. This means that a victim who suspects she is being tracked cannot use her iPhone to confirm or deny her suspicion—she must wait for Apple's system to generate an alert, if it ever does.

69. Third, the alert system is unreliable. There have been numerous documented cases in which iPhone users were not notified that an unknown AirTag was traveling with them despite the AirTag having been present for extended periods. Reasons for these failures include Bluetooth

connectivity issues, software bugs, and the fact that the alert system can be confused if the victim and the AirTag owner happen to be in proximity to one another on a regular basis (as is often the case with intimate partner violence).

70. Fourth, the notification only gets sent to individuals who have (1) iPhones, iPads, or iPod Touches that (2) run iOS version 14.5 or later. This means that the notifications do not appear for owners of older iPhones running older software.[15]

**Remedies for Android Users and Their Limitations**

71. The situation for Android users—approximately half of all American smartphone users--is substantially worse. Android users do not receive automatic notifications when an unknown AirTag is traveling with them. From the time of the AirTag's launch until several months later, Android users had essentially no way to detect an AirTag that had been placed on their belongings.

72. In response to public pressure, Apple released an Android application called "Tracker Detect" in December 2021—approximately eight months after the AirTag's release. However, the Tracker Detect application was grossly inadequate. It required users to actively and manually open the app and initiate a scan; it did not run in the background and did not provide automatic alerts. This meant that an Android user would only discover an AirTag if she happened to open the Tracker Detect app and scan for devices--a step that the vast majority of users would never think to take.

---

[15] The notification also purportedly enables the iPhone, iPad, or iPod Touch user to have the AirTag emit a beep so that it can be located. As discussed infra, the sound the AirTag emits is hard to hear and easily confused with other gadgets. More importantly, however, this feature appears not to work reliably. One reporter who tested it stated: "The AirTag was literally inches away from [the test] phone, but it wouldn't connect. We tried multiple times. Nada. The same thing happened to me when I was trying to find which pocket of my bag my husband had stashed his AirTag in. My phone was in my hand. My bag was in my other hand. Nothing. This is obviously an issue, as it's hard to get rid of an unknown AirTag if you can't find it. Another problem is that sound alerts may not be helpful if a victim is trying to find the tracker discreetly without tipping off their abuser." Monica Chin & Victoria Song *AirTags Are Dangerous -- Here's How Apple Could Fix Them*, THE VERGE (Mar. 1, 2022) https://www.theverge.com/2022/3/1/22947917/airtags-privacy-security-stalking-solutions.

73. Moreover, Tracker Detect was not widely adopted. By the time Apple announced a partnership with Google to improve AirTag detection for Android users in May 2023, Tracker Detect had been downloaded only approximately one million times—a tiny fraction of the hundreds of millions of Android users in the United States alone.

74. The Electronic Frontier Foundation raised additional concerns about Apple's approach to Android protection. In particular, the EFF identified patents that Apple had filed that suggested the company was aware of the ability to provide background scanning for Android users but had chosen not to implement it. The EFF raised concerns that Apple's patent strategy was designed to prevent competitors from developing better tracking protection tools for Android users.[16]

75. The inadequacy of Android protection was not lost on Apple's own engineers. In March 2022, Google publicly noted that background scanning for unknown AirTags on Android was technically feasible and offered to work with Apple to implement it. When asked about this, an Apple spokesman stated that implementing background scanning on Android would drain users' batteries—a justification that critics noted was inconsistent with the fact that numerous other applications, including Apple's own applications, routinely run in the background on Android devices.[17]

76. The long-delayed and inadequate Android protection meant that for the first eight months after the AirTag's release, and for years afterward in practical terms, Android users had essentially no meaningful protection against AirTag stalking. Apple's decision to release the AirTag without adequate Android protection--despite knowing that approximately half of American smartphone users are Android users--was a fundamental design flaw that predictably resulted in harm to Android users.

77. In May 2023, Apple and Google announced a joint industry specification for alerting users of unwanted tracking devices across both iOS and Android. While this was a step in

---

[16] *Id.*
[17] *Id.*

the right direction, it came nearly two years after the AirTag's release and long after thousands of victims had already been harmed.

**Operating-System-Independent Remedies and Their Limitations**

78. In addition to the smartphone-based alert systems, Apple designed the AirTag to emit a sound after it has been separated from its owner for an extended period. This sound alert is intended to help victims locate a hidden AirTag.

79. However, the sound alert has numerous significant limitations. First, the AirTag's speaker produces a sound of approximately 60 decibels--roughly equivalent to a normal conversation. This is not loud enough to be heard if the AirTag is hidden in a car engine compartment, inside a bag, or in other locations where sound is muffled. Second, the sound is not distinctive. Unlike, for example, a smoke alarm, the AirTag's alert sound is not something that most people would immediately recognize as a distress signal or a warning of unwanted tracking.

80. Third, and most significantly, the AirTag's sound alert can be disabled by physically removing the speaker from the device. This is not a difficult modification--it requires only a small tool and a few minutes of effort. Almost immediately after the AirTag's release, vendors on eBay, Etsy, and other online resale platforms began selling AirTags with their speakers removed, explicitly marketed for surveillance and tracking purposes. These "silent AirTags" were available for purchase by anyone with internet access, for prices only marginally higher than the standard AirTag.

81. Apple was aware of the sale of silent AirTags on these platforms. Despite this knowledge, Apple took no meaningful action to prevent their sale or to modify the AirTag's design to prevent the speaker from being removed. Apple could have, for example, designed the AirTag so that the speaker was not removable, or so that the device would disable itself if the speaker was removed. Apple chose not to implement these design changes.

82. The existence of silent AirTags created a particularly cruel dilemma for victims. Because silent AirTags do not emit a sound, victims could not rely on sound alerts to locate a hidden device. This meant that victims who suspected they were being tracked but had not received

a smartphone notification--for example, Android users who did not have the Tracker Detect app—had essentially no way to locate a silent AirTag hidden on their belongings.

83. Even when a victim discovers an AirTag, she faces a dilemma: if she removes the battery from the AirTag (the only way to disable it), she destroys potential evidence that might be needed for a criminal prosecution or civil proceeding. If she leaves the AirTag in place, she continues to be tracked. Law enforcement agencies have generally been unable to provide meaningful guidance on this dilemma, and many officers who receive AirTag stalking reports lack the training to properly handle the device as evidence.

84. Taken together, the limitations of the available remedies demonstrate that Apple's design choices shifted the burden of protection from the manufacturer to the victim. Rather than designing the AirTag to be safe from the outset--by, for example, requiring affirmative consent from tracked individuals, implementing robust background scanning for Android users, or designing the speaker so that it could not be removed--Apple released a fundamentally unsafe product and then asked victims to protect themselves using tools that Apple knew were inadequate. Apple further compounded this by pressuring its competitors and third-party developers to implement detection tools rather than fixing the underlying defects in its own product.

**F. At All Relevant Times, Alternative Feasible Designs Were Available, Which Could Have Made AirTags Safer**

85. Apple's carelessness in designing AirTags was magnified by the fact that alternative, feasible designs were available that could have made AirTags substantially safer. Apple knew that these alternatives existed -- indeed, it later adopted many of them -- yet it chose to launch AirTags without them.

86. When AirTags were first released, Apple programmed the device to alert a potential stalking victim only after three days of being unknowingly tracked. Apple subsequently shortened that window to between eight and twenty-four hours. Apple could have launched AirTags with the shorter alert window from the outset.

87. Apple could have launched AirTags with a companion Android application available at the time of release, ensuring that Android users -- who constitute the majority of smartphone users worldwide -- received meaningful and timely anti-stalking protections from day one. Instead, Apple released AirTags without any Android protection for months, leaving Android users completely exposed.

88. Apple could have designed AirTags so that alert notifications were stored and available for later recall, enabling victims and law enforcement to review a history of tracking alerts. Instead, Apple's system provides no persistent alert history, depriving victims of critical evidence.

89. Apple could have designed a remote disable feature allowing a victim -- or law enforcement -- to disable a stalker's AirTag upon discovery without physically destroying the device, thereby preserving evidence while eliminating the tracking threat.

90. Apple could have designed a "mute" location feature allowing a victim to prevent a stalker from continuing to receive location data from an AirTag discovered on the victim's person or property.

91. Apple could have designed its notification system so that alerts to the AirTag's owner were triggered only when the owner viewed the AirTag's location, rather than on a continuous, real-time basis, thereby reducing the utility of AirTags for covert surveillance.

92. Apple could have limited moment-by-moment, real-time tracking capabilities behind an identity verification requirement, ensuring that individuals using AirTags for covert surveillance could be identified and held accountable.

93. Apple could have placed the real-time tracking functionality of AirTags behind a subscription paywall linked to verified user identity, creating an additional barrier to anonymous misuse and a traceable record of who was using the tracking feature.

94. Apple could have designed AirTags with tamper-proof speakers that could not be easily disabled, removed, or muffled, ensuring that the audible alert function -- which is supposed

to warn victims of a tracking device's presence -- could not be defeated by a stalker with rudimentary tools.

95. The existence and feasibility of these alternative designs demonstrates that the AirTag was, and remains, defectively designed. Apple's decision to launch AirTags without these safeguards, and its slow, piecemeal adoption of some of them only after public outcry, reflects a conscious disregard for the privacy and safety of the consumers and third parties foreseeably harmed by its product.

### G. Victims of AirTag Stalking Have Little Meaningful Recourse in the Criminal Justice System

96. AirTag stalking victims have little meaningful recourse through the criminal justice system. Only twenty-three states have enacted laws specifically prohibiting electronic tracking, leaving victims in the remaining states without a clear statutory remedy even when law enforcement is willing to act.[18]

97. Stalking is chronically underrecognized, undercharged, and under-prosecuted across the United States. As the Stalking Prevention, Awareness, and Resource Center (SPARC) has documented, law enforcement agencies frequently fail to identify stalking behavior, fail to charge stalking offenses even when identified, and fail to prosecute cases through to conviction -- leaving victims without protection or justice.

98. According to the U.S. Department of Justice, Bureau of Justice Statistics, more than six million people are stalked annually in the United States.[19] Yet only approximately forty percent of stalking incidents are ever reported to law enforcement, and of those reported, only approximately eight percent result in an arrest.[20] The overwhelming majority of stalkers face no legal consequence whatsoever.

---

[18] Alexis McAdams, *Apple AirTags, meant to help you track your stuff, have become tools of stalkers and criminals*, FOX NEWS (June 14, 2022), https://www.foxnews.com/tech/apple-airtag-stalking-dangerous-crime.

[19] Megan Stone, *After 9-year fight to prosecute her stalker, woman shares story to help other survivors*, ABC NEWS (Jan. 5, 2021), https://abcnews.com/GMA/Living/yearfight-prosecute-stalker-woman-shares-story-survivors/story?id=74878256.

[20] *Id.*

99. Apple has publicly claimed that it works cooperatively with law enforcement in AirTag stalking investigations. This claim is misleading. As set forth below, the realities of law enforcement engagement with AirTag stalking -- and Apple's own data retention and disclosure practices -- render meaningful criminal prosecution virtually impossible in the vast majority of cases.

**1. First, prosecution rates are low and law enforcement is frequently disinterested.**

100. Law enforcement agencies across the country have demonstrated a consistent pattern of disinterest in, and misunderstanding of, AirTag stalking complaints. Victims who report AirTag stalking to police are routinely dismissed, told that the conduct does not constitute a crime, or informed that the agency lacks the resources or expertise to investigate.

101. For example, Kimberly Scroop attempted to file a police report after discovering an AirTag on her vehicle. The responding officers refused to take a report, telling her that there was nothing they could do and that the device was not illegal.[21]

102. Similarly, a victim identified as Angelina in Chicago reported to police that she had found an AirTag on her car. The officers who responded did not know what an AirTag was and were unable to offer any meaningful assistance or guidance.[22]

103. Another victim, identified as Carney, chose not to file a police report at all after discovering an AirTag tracking her -- out of fear of retribution from the person she suspected of placing the device. Her fear reflects a rational response to a system that provides victims with little protection and significant risk.[23]

---

[21] Ellie Fry, *Inside chilling rise of AirTag stalking as Apple device is branded 'gift to abusers'*, THE MIRROR (Apr. 24, 2023), https://www.mirror.co.uk/tech/inside-chilling-rise-airtag-stalking-29746435.

[22] *Id.*

[23] *AirTag stalking victims unconvinced by Apple fixes*, RFI (Feb. 15, 2023), https://www.rfi.fr/en/business-and-tech/20230215-airtag-harassment-victims-unconvinced-by-apple-s-fixes.

**2. Second, Apple does not provide full information to investigators or victims.**

104. Even in those rare cases where law enforcement is willing to investigate an AirTag stalking complaint, Apple's own data retention and disclosure practices severely limit what investigators can learn. Apple retains pairing information -- the data linking an AirTag to its owner's Apple ID -- for only twenty-five days. After that window closes, the identity of the person who registered and controls the AirTag may be permanently lost.

105. This twenty-five-day retention limitation is crippling to investigations. AirTag stalking victims frequently do not discover that they have been tracked until weeks or months after the tracking began. By the time a victim reports the incident, contacts an attorney, or law enforcement initiates an investigation, the pairing data identifying the stalker may already have been deleted.

106. As one commentator has observed: "What all this shows is how such a relatively innocuous piece of technology can have massive unintended consequences, but Apple's response to the privacy nightmare it's created has been slow and piecemeal. While the company touts that it will give up any information to law enforcement regarding tracking, Apple's strategy puts the onus on regular people to be aware of the technology and actively scan for it on their person."[24] This observation captures the fundamental failure at the heart of this case.

## H. The Federal Trade Commission Makes Clear That Stalking Technologies Violate Section 5 of the FTC Act

107. The Federal Trade Commission ("FTC") has made clear through its enforcement actions that technologies enabling covert location tracking -- particularly technologies that can be weaponized to stalk, surveil, or monitor individuals without their knowledge or consent -- constitute unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[24] Kyle Barr, *Apple Quietly Rolls Out New Updates That Could Prevent AirTag Stalking*, GIZMODO (Dec. 22, 2022), https://gizmodo.com/apple-airtags-stalking-tracking-1849922603.

108. In August 2022, the FTC filed suit against Kochava Inc. for selling geolocation data harvested from millions of mobile devices.[25] The FTC's complaint alleged that Kochava's data products enabled third parties to track consumers to sensitive locations, including domestic violence shelters, addiction recovery facilities, and places of worship. The FTC characterized this conduct as causing "substantial injury to consumers that consumers cannot reasonably avoid," squarely within the FTC's definition of an unfair practice under Section 5.

109. The FTC's theory in Kochava applies with equal or greater force to Apple's AirTags. Unlike a data broker selling aggregated location information, AirTags enable real-time, targeted, covert tracking of a specific individual -- the paradigmatic stalking scenario. The injury to the tracked individual is direct, immediate, and severe, and it is injury that the victim cannot reasonably avoid given Apple's inadequate anti-stalking protections.

110. In 2019, the FTC took enforcement action against Retina-X Studios, LLC, a developer of stalking applications marketed as parental monitoring tools but widely used for covert surveillance. The FTC found that Retina-X's applications were "designed to run surreptitiously" and were "uniquely suited to illegal and dangerous uses," including stalking and domestic abuse. The FTC concluded that marketing and selling such applications constituted an unfair practice under Section 5.[26]

111. The FTC's Retina-X enforcement action is directly instructive here. Like Retina-X's applications, AirTags are designed to operate covertly -- the device is small, easily concealed, and produces no visible indication of its presence to the person being tracked. Like Retina-X's applications, AirTags have proven uniquely suited to illegal and dangerous uses, particularly

---

[25] *FTC Sues Kochava for Selling Data that Tracks People at Reproductive Health Clinics, Places of Worship, and Other Sensitive Locations*, FEDERAL TRADE COMMISSION (August 29, 2022), https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other.

[26] *FTC Brings First Case Against Developers of "Stalking" Apps*, FEDERAL TRADE COMMISSION (Oct. 22, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/10/ftc-brings-first-case-against-developers-stalking-apps.

stalking and domestic abuse. And like Retina-X, Apple marketed and sold AirTags with actual and constructive knowledge of their widespread misuse for covert surveillance.

**I. Plaintiff's Experience With AirTags**

112. Plaintiff is a resident of Salina, Oklahoma. At all relevant times, Plaintiff used an Apple iPhone.

113. Beginning on or about January 1, 2022, Plaintiff's former romantic partner hid confirmed Apple AirTags to track her without her knowledge or consent.

114. The AirTags tracked Plaintiff's movements. Although she carried an iPhone, Plaintiff never received a notification from Apple that an unknown AirTag was traveling with her.

115. Plaintiff learned she was being tracked through her cellular carrier, AT&T.

116. Her former partner used the AirTags to locate Plaintiff and abuse her, to the point of a life-threatening incident. Plaintiff reported to law enforcement.

117. As a direct result of being tracked, Plaintiff was subjected to stalking, threats, physical violence, sexual assault, kidnapping or attempted kidnapping, and destruction of property.

118. Plaintiff told friends and family about the tracking, and has supporting documentation including a police report, medical and therapy records, and photos of her injuries.

119. Being tracked without her knowledge and consent caused Plaintiff fear, anxiety, and emotional distress. She has suffered, and continues to suffer, harm as a direct and proximate result of Apple's defective product design, failure to warn, and conscious disregard for the safety and privacy of Plaintiff and other foreseeable victims of AirTag stalking.

120. In addition to her emotional distress, Plaintiff incurred economic damages, including medical and therapy expenses and property loss. These economic injuries constitute injury in fact and lost money or property within the meaning of the UCL, conferring standing under California Business and Professions Code § 17200 et seq.

## CAUSES OF ACTION

### COUNT I

### (Negligence)

121. Plaintiff repeats and realleges all preceding paragraphs contained herein.

122. Apple owed Plaintiff--and all foreseeable victims of AirTag-enabled stalking--a duty of care in the design, marketing, and introduction of the AirTag into the stream of commerce. That duty is evidenced by Apple's unique and singular position as the exclusive operator and gatekeeper of the "Find My" network: Apple alone controls the infrastructure through which every AirTag communicates location data, and Apple alone possesses the technical capability to monitor, limit, or restrict the use of AirTags for covert, nonconsensual surveillance. The surreptitious nature of AirTag tracking--deliberately engineered to be silent, invisible, and continuous—further underscores Apple's duty to ensure that its product could not be readily weaponized against innocent persons.

123. Apple's duty of care extends to Plaintiff because Apple, by placing the AirTag into the stream of commerce without adequate safeguards, put Plaintiff at an unreasonable and foreseeable risk of harm through the foreseeable actions of third-party stalkers and abusers. This duty is cognizable under California law for the following independently sufficient reasons: (1) the harm to stalking victims was clearly foreseeable and was, in fact, foreseen by Apple before the AirTag's launch; (2) Plaintiff suffered actual, serious harm as a direct result of Apple's design and marketing choices; (3) there is a close and logical causal connection between Apple's defective design and marketing of the AirTag and the stalking of Plaintiff—Apple created the instrumentality, furnished it to the market without adequate controls, and the foreseeable harm materialized; (4) Apple bears moral blame for the stalking enabled by its product because Apple minimized, dismissed, and deprioritized internal and external safety concerns in favor of commercial success; (5) a strong public policy of preventing exactly the harms at issue here is enshrined in the California Constitutional Right to Privacy, Article I, Section 1 of the California Constitution, and the California Invasion of Privacy Act, California Penal Code § 630 et seq.; and

(6) the burden on Apple of implementing technically feasible safety measures is substantially outweighed by the policy interests in preventing stalking, harassment, domestic violence, and the physical and psychological injuries that foreseeably result therefrom.

124. Apple breached its duty of care by rushing the AirTag to market without implementing adequate anti-stalking safeguards. Apple knew before launch that its device would be used to stalk and harm innocent people. Apple nonetheless prioritized speed to market and commercial revenue over the safety of foreseeable victims, releasing the AirTag with only minimal and demonstrably ineffective protective measures.

125. Apple's breach was the actual and proximate cause of Plaintiff's injuries. The causal chain is direct and unbroken: Apple introduced a precision tracking device that it designed to be small, concealable, long-lasting, and globally networked; Apple knew before launch that the device would be misused by stalkers; Apple's deficient safeguards failed to deter or prevent that misuse; and the anticipated and foreseeable misuse of the AirTag caused the injuries Plaintiff suffered. Apple's conduct was a substantial factor in bringing about Plaintiff's harm. The criminal acts of Plaintiff's former romantic partner, who hid AirTags to track Plaintiff, do not break the causal chain because the very purpose of Apple's duty of care was to protect against the foreseeable criminal misuse of its product. Under California law, a manufacturer's liability is not negated by the foreseeable intervening criminal acts of third parties when, as here, the manufacturer created the conditions that made such acts possible and failed to implement available safeguards to prevent them.

126. As a direct and proximate result of Apple's negligence, Plaintiff has suffered and continues to suffer significant harm, including but not limited to anxiety, stress, disruption to her daily life and activities, and related damages. Plaintiff seeks injunctive relief, compensatory damages, and punitive damages. Apple's conduct in ignoring known safety risks and placing commercial profit over the safety of foreseeable victims was malicious, oppressive, and willful, and was carried out with conscious disregard for the rights and safety of Plaintiff and others similarly situated, warranting an award of punitive damages under California Civil Code § 3294.

**COUNT II**

**(Strict Liability -- Design Defect -- Risk-Benefit Test)**

127. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

128. Apple is in the business of designing, manufacturing, distributing, and selling AirTag tracking devices. Apple designed the AirTag, manufactured it (or caused it to be manufactured), and placed it into the stream of commerce through its retail stores, website, and authorized resellers.

129. The AirTag was defectively designed at the time it left Apple's control. The AirTag's design--including its size, concealability, battery life, integration with the "Find My" network, and the absence of adequate anti-stalking protections--rendered it unreasonably dangerous as designed.

130. Plaintiff was harmed because of the AirTag's defective design. AirTags were hidden to track Plaintiff without her knowledge or consent, and Plaintiff was subjected to continuous, surreptitious location tracking that caused her substantial injury.

131. The AirTag's defective design was a substantial factor in causing Plaintiff's harm. But for Apple's defective design choices--including the failure to implement consent mechanisms, verified registration, and meaningful anti-stalking alerts--the stalking of Plaintiff would not have occurred or would have been prevented or interrupted at a much earlier stage.

132. The benefits of the AirTag's design do not outweigh its risks. In conducting the risk-benefit analysis required under California products liability law, the following factors weigh in favor of Plaintiff: (a) the gravity of harm is severe--AirTag-enabled stalking has resulted in physical violence, domestic abuse, and death, and the psychological harm inflicted on stalking victims is profound and lasting; (b) the likelihood of harm was high and was actually foreseen by Apple before the AirTag's launch; (c) a feasible alternative safer design existed and was identified by Apple's own engineers--including opt-in consent requirements, verified identity registration, earlier and louder separation alerts, and law enforcement access protocols; (d) the cost of the

alternative design was low relative to Apple's technical capabilities and resources; and (e) the disadvantages of the alternative design were minimal and did not outweigh the safety benefits--safer design would have preserved all legitimate uses of the AirTag while dramatically curtailing its use as a stalking tool.

133. As a direct and proximate result of the AirTag's defective design, Plaintiff has suffered the same injuries described above. Plaintiff seeks the same relief as set forth in Count I, including injunctive relief, compensatory damages, and punitive damages.

**COUNT III**

**(California Business and Professions Code § 17200 et seq. -- Unlawful Prong)**

134. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

135. Apple's conduct in designing, manufacturing, marketing, and selling the defectively designed AirTag amounts to negligence and product liability as set forth in Counts I and II above. These violations of substantive tort law constitute predicate unlawful acts and practices within the meaning of the UCL's unlawful prong.

136. Each of the foregoing violations--Apple's negligence in designing and releasing a product it knew posed unreasonable safety risks, and Apple's strict liability for placing a defectively designed product into the stream of commerce—independently and collectively serves as a predicate violation supporting a claim under the unlawful prong of California Business and Professions Code § 17200.

137. Plaintiff has standing to bring this claim under the UCL. Plaintiff suffered injury in fact and lost money or property as a result of Apple's unlawful business practices.

138. Pursuant to California Business and Professions Code § 17203, Plaintiff seeks an order enjoining Apple from continuing to engage in unlawful business practices in connection with the design, manufacture, marketing, and sale of the AirTag, and requiring Apple to implement adequate anti-stalking safeguards.

**COUNT IV**

**(California Business and Professions Code § 17200 et seq. -- Unfair Prong)**

139. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

140. The wrongful conduct forming the basis of Plaintiff's claims in this litigation occurred and originated in California. Defendant does substantial business in California, is headquartered in California, and California is the location of all design, promotional literature, and advertising decisions, and of all material decisions concerning the AirTag's anti-stalking safeguards.

141. Apple's business practices in connection with the AirTag are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers and to stalking victims. Apple designed and released a product it knew would be weaponized against innocent people, responded to documented harm with inadequate half-measures, and continued to prioritize AirTag revenue over the safety of foreseeable victims.

142. The gravity of the harm caused by Apple's conduct is not outweighed by any legitimate utility of Apple's design choices. The challenged design decisions--including the failure to implement consent mechanisms, verified registration, and adequate alert systems--did not meaningfully benefit consumers or advance any legitimate business purpose that could not be achieved through a safer alternative design.

143. Apple's unfair practices undermine public policy that is tethered to, and reflected in, the California Invasion of Privacy Act, California Penal Code § 630 et seq., and the California Constitutional Right to Privacy, Article I, Section 1 of the California Constitution. These legislative and constitutional enactments reflect California's strong and enduring policy interest in protecting individuals from covert, nonconsensual surveillance--the precise harm that Apple's unfair business practices have enabled on a massive scale.

144. The injury caused by Apple's unfair practices is substantial. Tens of thousands of individuals have been stalked using AirTags. The harm is not outweighed by any countervailing

benefits of Apple's design choices, because safer and equally functional alternatives were available and feasible. The harm is not the kind of injury that consumers could reasonably have avoided: AirTag stalking victims did not and could not consent to being tracked and had no ability to protect themselves from a tracking device covertly concealed by a third party.

145. Reasonably available alternatives existed that would have prevented or substantially reduced the harm without materially impairing the AirTag's legitimate utility. Apple's failure to adopt those alternatives, despite knowing the harm its design was causing, constitutes an unfair business practice.

146. Apple's unfair business practices constitute a continuing course of conduct. Apple continues to design, manufacture, market, and sell AirTags without adequate anti-stalking protections, and continues to profit from the sale of a product it knows is being used to harm innocent people.

147. Plaintiff has standing to bring this claim under the UCL. Plaintiff suffered injury in fact and lost money or property because of Apple's unfair business practices.

148. Pursuant to California Business and Professions Code § 17203, Plaintiff seeks an order enjoining Apple from continuing to engage in unfair business practices in connection with the AirTag and requiring Apple to implement adequate anti-stalking safeguards.

**COUNT V**

**(Failure to Warn)**

149. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

150. Apple had a duty to warn consumers and foreseeable users -- including individuals who do not own Apple products but who may be subjected to AirTag tracking -- of the known dangers and risks of the AirTag, including its potential for misuse as a stalking and surveillance tool.

151. Apple knew or should have known, at and before the time of the AirTag's release, that the device posed significant risks of stalking, harassment, and domestic violence. Apple was

warned by its own engineers, by domestic violence advocates, by cybersecurity experts, and by technology journalists that the AirTag, as designed, would be weaponized to covertly track and surveil individuals without their knowledge or consent.

152. Despite this knowledge, Apple failed to provide adequate warnings to consumers, purchasers, or foreseeable victims about the AirTag's stalking risks. Apple's marketing materials, packaging, and public statements omitted material information about the known dangers of the product and affirmatively misrepresented the adequacy of the AirTag's anti-stalking protections. Apple characterized the AirTag as "stalker-proof" without disclosing the significant limitations of its safety features.

153. Apple further failed to warn law enforcement agencies about the capabilities and dangers of the AirTag, contributing to the widespread inability of law enforcement to assist AirTag stalking victims.

154. Apple's failure to warn was a proximate cause of Plaintiff's injuries. Had Apple provided adequate warnings about the AirTag's stalking risks, Plaintiff and other foreseeable victims would have been better positioned to protect themselves, and law enforcement would have been better equipped to respond to AirTag stalking reports.

155. As a direct and proximate result of Apple's failure to warn, Plaintiff has suffered the injuries described herein. Plaintiff seeks compensatory damages, punitive damages, and injunctive relief.

**COUNT VI**

**(Fraudulent Concealment and Intentional Misrepresentation)**

156. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

157. Apple had exclusive knowledge of material facts relating to the AirTag's stalking risks that were not known to, and could not reasonably have been discovered by, Plaintiff and the public. These material facts include, but are not limited to: (a) internal warnings from Apple engineers about the AirTag's stalking potential prior to its release; (b) the inadequacy of the

AirTag's anti-stalking protections, including the delayed alert system and the absence of meaningful protections for Android users; (c) the ease with which the AirTag's speaker could be removed to create a silent tracking device; and (d) the volume and severity of stalking reports Apple received following the AirTag's release, including reports of physical violence and murder facilitated by AirTags.

158. Apple had a duty to disclose these material facts to the public because: (a) Apple had exclusive knowledge of facts not known to the public; (b) Apple actively concealed these facts through misleading public statements and marketing; and (c) Apple made partial representations about the AirTag's safety features that were misleading absent disclosure of the material facts described above.

159. Apple intentionally concealed these material facts and affirmatively misrepresented the safety of the AirTag through its public statements characterizing the device as "stalker-proof," its marketing materials that emphasized anti-stalking features while omitting known limitations, and its public relations campaign that sought to minimize and dismiss the documented risks of AirTag-enabled stalking.

160. Apple made these misrepresentations and omissions with knowledge of their falsity, or with reckless disregard for their truth or falsity. Apple's CEO Tim Cook was personally briefed on the scope of the AirTag stalking crisis. Apple's engineers had identified the product's stalking risks before launch. Apple received over 40,000 reports of AirTag misuse. Despite this knowledge, Apple continued to market the AirTag as a safe consumer product.

161. Plaintiff and the public reasonably relied on Apple's unwanted-tracking notifications, but Plaintiff carried an iPhone and never received an Apple notification that an unknown AirTag was traveling with her; she learned of the tracking through her carrier, AT&T.

162. As a direct and proximate result of Apple's fraudulent concealment and intentional misrepresentation, Plaintiff has suffered the injuries described herein. Plaintiff seeks compensatory damages, punitive damages, and any other relief this Court deems just and proper.

**COUNT VII**
**(Violation of the Oklahoma Consumer Protection Act, 15 O.S. § 751 et seq.)**

163. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

164. The Oklahoma Consumer Protection Act ("OCPA") is remedial and is liberally construed to effectuate its purpose. Patterson v. Beall, 2000 OK 92, ¶ 28, 19 P.3d 839.

165. **Consumer Transaction.** Apple's advertising, sale, and distribution of AirTags are consumer transactions within 15 O.S. § 752(2), and Apple engaged in the challenged practices in the course of its business.

166. **False Representations.** Apple made false representations, knowingly or with reason to know, as to the characteristics, uses, and benefits of AirTags, in violation of 15 O.S. § 753(5), including that AirTags had adequate safeguards against unwanted tracking and that iPhone users would be warned when an unknown AirTag traveled with them.

167. **Deceptive and Unfair Practices.** Apple committed deceptive trade practices, a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person," which "may occur before, during or after a consumer transaction," 15 O.S. § 752(13), and unfair trade practices that offend established public policy and are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," 15 O.S. § 752(14), in violation of 15 O.S. § 753(21)

168. **Public Policy.** Apple's practices offend Oklahoma's established public policy against stalking. Oklahoma's stalking statute provides that "following" includes "the tracking of the movement or location of an individual through the use of a Global Positioning System (GPS) device or other monitoring device" without that person's consent. 21 O.S. § 1173.

169. **Elements.** The elements of a private OCPA claim are an unlawful practice, conduct in the course of Defendant's business, injury in fact to Plaintiff as a consumer, and causation. Patterson v. Beall, 2000 OK 92, ¶ 31, 19 P.3d 839. Oklahoma does not require that the challenged practice affect the public interest. Id. ¶ 32.

170. **Aggrieved Consumer.** Plaintiff is an aggrieved consumer and relied on Apple's unwanted-tracking notifications. Plaintiff suffered injury in fact caused by Apple's unlawful practices.

171. **Unconscionability.** Apple's practices were unconscionable, rendering Apple liable for a civil penalty of not more than $2,000 per violation under 15 O.S. § 761.1(B).

172. Pursuant to 15 O.S. § 761.1(A), Plaintiff seeks actual damages, costs of litigation, and reasonable attorneys' fees, and civil penalties under § 761.1(B).

**COUNT VIII**
**(Invasion of Privacy, Intrusion Upon Seclusion)**

173. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

174. **Oklahoma Law.** Oklahoma recognizes the tort of intrusion upon seclusion as defined in Restatement (Second) of Torts § 652B. Guilbeau v. Durant H.M.A., LLC, 2023 OK 80 (citing Munley v. ISC Financial House, Inc., 1978 OK 123, 584 P.2d 1336, and Gilmore v. Enogex, Inc., 1994 OK 76, 878 P.2d 360). The claim has two elements: (1) a nonconsensual intrusion and (2) an intrusion that would be highly offensive to a reasonable person. Gilmore*,* 1994 OK 76, ¶ 16, 878 P.2d at 366.

175. **Intentional Intrusion.** Apple intentionally intruded on Plaintiff's solitude, seclusion, and private affairs by designing, deploying, and maintaining a product and network, the AirTag and Find My network, that intentionally and continuously geolocated Plaintiff, transmitting her precise physical location to a third party without her knowledge or consent.

176. **Apple's Role and Privacy Interest.** Apple did not merely manufacture a passive device. Apple created and maintains the Find My network, a vast infrastructure of hundreds of millions of Apple devices, that actively detects AirTag signals and reports precise location data back to Apple, which then transmits that location to the AirTag's owner. Apple's network is the instrumentality through which the intrusion upon Plaintiff's seclusion occurred. Without Apple's active role in processing and transmitting Plaintiff's location data through its network, the

continuous precise geolocation of Plaintiff would not have been possible. Plaintiff had a reasonable expectation of privacy in her constant, precise physical location. A person's continuous, real-time, precise location, including movements to and from home, work, places of worship, medical providers, and any other location, is among the most sensitive categories of private information.

177. **Highly Offensive.** The transmission of Plaintiff's constant, precise physical location to a known or unknown third party without her knowledge or consent would be highly offensive and objectionable to a reasonable person and is likely to cause mental suffering. Oklahoma's public policy against stalking, reflected in 21 O.S. § 1173, supports the offensiveness of this intrusion.

178. **Causation and Damages.** As a direct and proximate result of Apple's intrusion, Plaintiff suffered fear, anxiety, emotional distress, and economic damages as described above. Plaintiff is entitled to recovery against Apple in an amount to be determined at trial.

179. Plaintiff seeks punitive damages because Apple acted in reckless disregard of the rights of others and intentionally and with malice. Plaintiff will prove entitlement to punitive damages under 23 O.S. § 9.1 by clear and convincing evidence. See United States Bank Nat'l Ass'n v. Hill, 2023 OK 86.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant Apple Inc. and grant the following relief:

(a) Judgment against Defendant Apple Inc. on all counts asserted in this Complaint;

(b) Injunctive, declaratory, and equitable relief as appropriate, including an order enjoining Apple from continuing to engage in the unlawful and unfair business practices described herein and requiring Apple to implement adequate anti-stalking safeguards in the AirTag and the "Find My" network;

(c) All compensatory and punitive damages in amounts to be proven at trial, together with pre-judgment and post-judgment interest as permitted by law;

(d) Reasonable attorneys' fees and the costs of litigation, pursuant to California Code of Civil Procedure § 1021.5, 15 O.S. § 761.1, and any other applicable authority;

(e) Such other and further relief as this Court deems just and proper.

Dated: November 4, 2026

Respectfully submitted,

/s/ D. Todd Mathews
D. Todd Mathews
*Pro Hac Granted, MDL 3199*
BAILEY GLASSER, LLP
210 W. Division St., Bldg. 2
Maryville, IL 62062
Phone: (618) 418-5180
Fax: (304) 342-1110
tmathews@baileyglasser.com

Lee A. Floyd
*Pro Hac Granted, MDL 3199*
FLOYD LAW
626 East Broad Street,
Suite 300
Richmond, Virginia 23219
Phone: (804) 529-0000
Fax: (804) 529-0009
lee@floydpc.com

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury of all claims and issues so triable in this action.

Dated: November 4, 2026

Respectfully submitted,

/s/ *D. Todd Mathews*

D. Todd Mathews
*Pro Hac Granted, MDL 3199*
BAILEY GLASSER, LLP
210 W. Division St., Bldg. 2
Maryville, IL 62062
Phone: (618) 418-5180
Fax: (304) 342-1110
tmathews@baileyglasser.com

Lee A. Floyd
*Pro Hac Granted, MDL 3199*
FLOYD LAW
626 East Broad Street,
Suite 300
Richmond, Virginia 23219
Phone: (804) 529-0000
Fax: (804) 529-0009
lee@floydpc.com